IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 17, 2012 Session

**DARRYL LARKINS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 98-D-2577     J. Randall Wyatt, Jr., Judge**

**No. M2011-00882-CCA-R3-PC - Filed September 25, 2012**

Petitioner, Darryl Larkins, appeals the denial of post-conviction relief from his convictions[1] for two counts of aggravated rape, one count of attempted aggravated rape, and one count of aggravated burglary.  On appeal, petitioner argues that he received the ineffective assistance of counsel.  After reviewing the record, the parties' briefs, and applicable law, we affirm the judgment of the post-conviction court
.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Justin Johnson, Nashville, Tennessee, for the appellant, Darryl Larkins.

Robert E. Cooper, Jr. Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Bret Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

I. Facts and Procedural History

A Davidson County grand jury returned a six-count indictment against petitioner, charging two counts of aggravated rape, two counts of especially aggravated kidnapping, one count of attempted aggravated rape, and one count of aggravated burglary.  This court's opinion on direct appeal stated the facts underlying the charges as follows:

---

[1] On direct appeal, this court reversed Petitioner's convictions for two counts of especially aggravated kidnapping.

On the morning of August, 13, 1998, [the victim][2] was visiting at the home of her cousin [ ], at approximately 5:45 a.m. After talking for about fifteen minutes, the two women decided to drive down the street to use a pay phone and call [the victim]'s sister. [The victim] was scheduled to be at her sister's house at 7:00 a.m., to ensure the safe boarding and departure of her sister's granddaughter on the school bus. [The victim] called her sister and assured her that she would be there by 6:45 a.m.

As the two women returned to [the cousin]'s home, they observed [petitioner] and another man (later identified as Quincy Fitzgerald) walking past [the cousin]'s home. [The victim] parked the car in front of [the cousin]'s home, and as [the cousin] exited the car, [petitioner] hollered her name from across the street and asked if she remembered him. [The cousin] acknowledged that she remembered [petitioner]. [The cousin] continued toward her front door, followed by [the victim] and [petitioner], who had crossed the street and began to follow the women into the house. The other young man remained on the sidewalk across the street.

[The cousin] unlocked the door of her home and [petitioner] followed the women inside. Once in the house, [petitioner] closed the door and pulled out a gun, which [the victim] stated was small and looked like a .22 caliber pistol. [Petitioner] grabbed about $18, which was on a nearby coffee table, and asked the women if they had any more money, to which they responded no. Then, [petitioner] demanded that both women take off their clothes. [Petitioner] told the women, "I want to f[]." [Petitioner] also claimed that he wanted someone to perform fellatio for him and that he wanted sex. [Petitioner] told the women to "[h]urry up. Hurry up, before I blow your damn brains out." Both [the victim] and [the cousin] testified that they were scared and afraid, and that they did not feel free to leave.

After the women had taken off their clothes, [petitioner] pulled his pants and shorts below his knees and instructed [the victim] to perform fellatio on him as he sat on the sofa. [The victim] stated that she complied, because she was afraid [petitioner] would shoot her. After about a minute and a half, [petitioner] made [the victim] lay on the floor and began having vaginal

---

[2]Consistent with this court's policy of protecting the identity of victims of sexual offenses, we will refer to the victim of the aggravated rapes as "the victim," the victim of aggravated burglary as "the cousin" or "cousin," and when referring to both victims, we will use the plural "victims."

-2-

intercourse with her. Again, [the victim] reluctantly complied. [The cousin] remained sitting in a chair, naked and too afraid to move.

While [petitioner] was having vaginal intercourse with [the victim], he laid the gun down, but warned [the victim], that if she touched the gun, he would "blow [her] damn brains out." At some point, [petitioner] closed his eyes and [the victim] grabbed the gun. [The victim] and [petitioner] began wrestling for the gun. [The cousin] came to [the victim]'s aid, jumped on [petitioner]'s back and pulled him off of [the victim]. [Petitioner] jumped up and ran into [the cousin]'s bedroom holding his pants. As [petitioner] ran, [the victim] fired two shots at him, but the gun jammed and prevented her from firing anymore shots at that time.

[The cousin] put on her clothes and went next door and asked her neighbor[,   ] to call the police. [The cousin] noticed that [petitioner] was trying to escape through her bedroom window, and [the victim] went outside and fired a shot at [petitioner] to keep him from fleeing. At some point, the police arrived and arrested [petitioner]. [The victim] was taken to General Hospital for an examination. [The victim] testified that she believed that [petitioner] had ejaculated, because she felt "wet." She explained that she felt no tears or bruises in her vagina, because the "leaking" or early ejaculation from [petitioner] had lubricated her vagina prior to penetration by [petitioner]. The physical examination of [the victim] revealed no signs of a physical struggle, although [the victim] stated that she had scratches on her hand from wrestling to get the gun from [petitioner]. At the hospital, a blood sample was taken from [the victim], and she tested positive for cocaine. [The victim] admitted to using cocaine two weeks prior to this incident, but stated that she had only used the cocaine two or three times, as a concerned parent, in an attempt to understand her son's drug problem. [The victim] further admitted that she did not tell the police or the medical personnel at the hospital about her use of cocaine, because she did not think it was relevant to her being raped. [The victim] stated that vaginal intercourse with [petitioner] had not been consensual and that she had never seen [petitioner] nor bought drugs from him or anyone else in front of [the cousin]'s home.

[The cousin]'s testimony corroborated that of [the victim]. [The cousin] further testified that she saw [the victim] and [petitioner] struggling for the gun, but she did not see [the victim] struggling while [petitioner] was having vaginal intercourse with [the victim]. [The cousin] stated that she had seen the bleeding scratches on [the victim]'s hands. [The cousin] told the jury that she

-3-

neither saw [the victim] using cocaine the morning of this incident, nor had she ever seen [the victim] using cocaine. [The cousin] also admitted that she had failed to tell the police about the $18 taken by [petitioner].

Officer Bobby Ratley testified that he was the first officer to arrive at [the cousin's] home. When he arrived, Officer Ratley observed [petitioner] attempting to crawl out of a window. He helped [petitioner] out of the window, cuffed him[,] and placed [him] in the back of the patrol car. Officer Ratley testified that both victims appeared upset and that [the victim] was partially clothed. Ratley further testified as to the facts related to him by the victims, regarding the rape, which corroborated the victim's testimonies. On cross-examination, Ratley said that the victims explained to him that [petitioner] had led them into the house at gun point. On redirect and re-cross, Officer Ratley acknowledged that his report did not state that the victims were taken into the house at gun point, and that he had mistakenly testified that they were taken in at gun point. He further testified that neither of the women had mentioned anything to him about [petitioner's] stealing $18.

Officer Raymond Raider testified that he was called to collect evidence at the scene of the crime. He received a .22 caliber pistol, plus six live rounds and three spent casings from the pistol. Officer Raider performed a black light test on the area of the floor where [petitioner] was reported to have had sex with [the victim]. Raider also performed the black light test on the love seat where [petitioner] had [the victim] perform fellatio on him. The black light test revealed no traces of semen in these designated areas.

Charles Jackson testified that, on the morning of these offenses, he heard shots fired and went to [the cousin]'s home. Jackson stated that he saw a man hanging out of the window to [the cousin]'s apartment. Jackson also testified that [the cousin] appeared to be upset. [The cousin] asked him to call [9-1-1] and he did.

Sandy Myers testified that she performs "medical-legal" examinations at Meharry and General Hospitals. She explained that she was one of a group of nurse practitioners who perform gynecological exams on victims of rape and sexual assault charges. She further stated that the purpose of the exam is to "examine the patient medically, and treat them for any possible diseases or potential pregnancy as a result of the assault, and to collect evidence." Myers testified that she has been called to testify, as to the result of a medical-legal exam, in three prior cases.

Myers testified that she performed an examination of [the victim] following the rape in this case. She stated that [the victim] said that her last consensual sex relationship had been two or three years prior to the examination. Myers took a urine and blood specimen from [the victim], and performed a "woods light" examination of [the victim]'s thighs and vaginal area. Myers also performed several other tests for the purpose of producing a rape kit. No sperm was detected from any of these tests, but [the victim] tested positive for cocaine. Myers stated that she found no signs of physical trauma on any part of [the victim]'s body. She explained that most rape victims do not show signs of physical trauma to the vaginal area. Myers noted that [the victim] did not mention the scratching and bleeding on her hands, for if [the victim] had, she would have written this information in her report. She further testified that she was unable to determine whether [the victim] had engaged in consensual or non-consensual sex with [petitioner]. Myers also stated that she routinely asked patients about whether they were taking any prescribed medicines, but not whether they used illegal drugs.

Sharon Jenkins, a forensic scientist with the Tennessee Bureau of Investigation (TBI), testified that she tested throat and vaginal swab samples taken from [the victim]. She told the jury that she detected sperm and semen on both the throat and vaginal slides. Jenkins also stated that she was not initially asked to perform a DNA test, but a DNA test was later requested and performed by Constance Howard, another forensic scientist with the TBI.

Constance Howard testified that she performed a DNA test on a blood sample taken from [petitioner] and on the sperm and semen found on the throat and vaginal swabs collected from [the victim]. The test performed by Howard indicated that [petitioner] was the depositor of the semen found on the vaginal swab taken from [the victim]. However, Howard stated that the only DNA detected from the throat swab was that of [the victim].

The State rested its case-in-chief at this point.

[Petitioner] testified that he and his friend, Quincy Fitzgerald, were walking down the street, when the two victims drove by and waived them over to the car and asked[,] "Do ya'll got some?" [Petitioner] testified that he understood the women to be asking for cocaine. He made the women believe he had some cocaine for them. The women did not have any money, so they

agreed to exchange sex for cocaine. [Petitioner] followed the women into [the cousin]'s home.

Upon entering the house, [petitioner] placed his gun on a table to establish the women's trust. [Petitioner] and [the victim] went into the kitchen and she performed fellatio on him, but that was taking too long, so they started having vaginal intercourse. After they finished, [the victim] began putting on her clothes and [petitioner] sat on the couch tying his shoes. [The victim] asked to see the drugs, but [petitioner] told her that he did not have any drugs, only some money. [The victim] grabbed [petitioner]'s gun and called [the cousin] to help her. The gun fired and [petitioner] ran into the bedroom. [The victim] threatened to kill him, so he attempted to go through the bedroom window, but she fired at him again. [Petitioner] asked Quincy Fitzgerald to call the police. [The victim] asked [petitioner] to "throw the dope out the window," and again he told her he did not have any cocaine. Then, [petitioner] found a plastic bag in the bedroom and threw it out the window to make [the victim] think it was some cocaine. A person named "Punky" picked up the bag and said that there was no cocaine in the bag.

When the police arrived, the gun was sitting on the air conditioner outside [the cousin]'s home. [Petitioner] ran to them and attempted to explain what had happened. He told the police that he was invited into the house and had not threatened either of the women. He testified that he was carrying a gun because he had been threatened by someone else and needed the gun for protection. [Petitioner] stated that he did not take any money from either of the women and that he did not force [the cousin] to take off her clothes. [Petitioner] further testified that [the victim] had consensual sex with him, because she thought she was going to get some drugs in return.

On cross-examination, [petitioner] admitted to giving inconsistent statements about whether he had sex with [the victim]. [Petitioner] explained that he gave Detective Brad Johns different stories because he was afraid, and the detective was threatening him. Later, [petitioner] told Detective Johns the truth. He stated that he and Quincy Fitzgerald had been up all night, but that they had not used any drugs or drank any alcohol. [Petitioner] said that he had $17 dollars on the day of this incident.

Quincy Fitzgerald testified that, on the morning of this incident, he and [petitioner] were walking down the street when a blue Ford Taurus, with the two victims inside, approached them. The women honked their horn, drove to

the end of the street, turned around and parked in front of [the cousin]'s home. [Petitioner] talked with the women, but Fitzgerald could not hear what they were saying. The exchange between [petitioner] and the women did not appear to be angry; they were just talking. Then, [petitioner] and the two women went into [the cousin]'s house. Fitzgerald testified that he sat on the porch of [the cousin]'s home with a female and waited for [petitioner]. At some point, he heard a gunshot. He panicked and ran down the street, but came back to find [petitioner] coming out of a window in the house. [The victim] had a gun pointed at [petitioner]. When the police arrived, he gave a statement about what he had seen.

On cross-examination, Fitzgerald testified that he and [petitioner] had used some drugs the night before the incident, but stated that his perception was not hampered by the drugs. He also stated that [petitioner] was asking for help as he was trying to come out the window.

At this point, the defense rested and the State called Detective Brad Johns as a rebuttal witness. Detective Johns testified that he had interviewed [petitioner] regarding this incident. [Petitioner] denied taking a gun into the house and said that the gun belonged to one of the victims.

At the close of the proof, the case was submitted to the jury. The jury ultimately convicted [petitioner] on all counts of the indictment. However, in Count VI on the jury verdict form, the jury initially indicated that [petitioner] was guilty of attempted aggravated burglary due to a mistake on the verdict form. The original charge for Count VI was aggravated burglary. Attempted aggravated burglary was not charged to the jury as a lesser-included offense. The trial court did not accept a verdict on Count VI at that time, but instructed the jury to re-deliberate as to Count VI and to follow the previous jury instructions. After re-deliberating, the jury found [petitioner] guilty of aggravated burglary. Subsequently, the trial court sentenced [petitioner] to an aggregate sentence of fifty years in the Tennessee Department of Correction.

*State v. Darryl A. Larkins*, No. M2000-00249-CCA-R3-CD, 2001 WL 543442, at *1-5 (Tenn. Crim. App. May 23, 2001). Petitioner appealed his convictions to this court. This court reversed the especially aggravated kidnapping convictions, affirmed the remaining convictions, and remanded the case to the trial court for re-sentencing on the offense of attempted aggravated rape. *Id.* at *12.

-7-

Petitioner timely filed a pro se petition for post-conviction relief alleging that he received ineffective assistance of counsel. The post-conviction court appointed counsel, who filed an amended petition incorporating the pro se petition and further arguing ineffective assistance of counsel. The post-conviction court held a hearing on the petition on January 20, 2011.

At the post-conviction hearing, trial counsel testified that petitioner's family hired him to represent petitioner. He said post-conviction counsel had asked him for petitioner's file, but he no longer had it. He believed that his ex-wife disposed of the file during their divorce in 2000. Petitioner's trial began on May 3, 1999, less than six months after his arraignment. During the time between petitioner's arraignment and trial, trial counsel was in the process of resolving issues he had with the Board of Professional Responsibility of the Supreme Court of Tennessee. Trial counsel explained, "[T]here were issues . . . with other cases that the Board found questionable or actionable and they were . . . presented to the board and I then talk[ed] with the Board about my position on those cases." On January 3, 1999, two months after petitioner's arraignment, the Board of Professional Responsibility temporarily suspended trial counsel and required him to have a monitoring attorney cosign all of his pleadings.

On February 10, 2000, trial counsel entered into a Tennessee Lawyers Assistance Program "Monitoring Advocacy Agreement." He did not recall the details of what the agreement required of him; however, he denied that his "testing clean" was part of the agreement. He further denied that he was in the program due to chemical dependency. According to trial counsel, he was only in the program because of depression, although the signed agreement indicated that he suffered from a "substance abuse, chemical dependency and/or a mental disorder."

The Board of Professional Responsibility dissolved the temporary suspension and reinstated trial counsel to the practice of law on March 30, 1999. Trial counsel "did a re-entry back onto [petitioner's] case" on April 12, 1999, slightly less than one month before trial.

The trial court denied petitioner's motion for new trial on September 17, 1999. Trial counsel did not timely file a notice of appeal. However, trial counsel filed a motion in this court requesting permission to late-file the notice of appeal. In an order filed February 25, 2000, this court waived the timely filing of the notice of appeal and gave trial counsel seven days to file a notice of appeal in the trial court. Trial counsel testified that he eventually filed the notice of appeal.

On July 10, 2000, the Tennessee Supreme Court suspended trial counsel's privilege to practice law in Tennessee for five years based on the Board of Professional Responsibility's findings of "a substantial risk of irreparable harm to the public because of his neglect of clients' matters." The supreme court's order precluded trial counsel from representing clients beginning thirty days after the issuance of the order. On August 28, 2000, this court filed an order removing trial counsel from petitioner's case on appeal due to his five-year suspension. In its order, this court noted that petitioner's brief for his direct appeal was due August 14, 2000, and trial counsel failed to file a brief for petitioner.

Regarding his preparation for petitioner's case, trial counsel testified that he did not obtain an audiotape of the recorded conversation between petitioner and Officer Finchum that occurred in the officer's patrol car. Likewise, trial counsel did not obtain an audiotape of petitioner's recorded conversation with Detective Brad Johns. He did not discuss the recorded conversation with petitioner, nor did he file a motion to suppress the statements.

Trial counsel recalled that the State presented Detective Johns as a rebuttal witness during petitioner's trial. He agreed that the transcript reflected that Detective Johns refuted petitioner's argument about ownership of the pistol. Trial counsel further agreed that he did not request *Jencks* material when Detective Johns testified if the trial transcript did not reflect his doing so.

Trial counsel did not recall going to the State's property room to review the physical evidence against petitioner. Trial counsel did not review the crime scene photographs or discuss them with petitioner. He also did not listen to the 9-1-1 recording, which the State did not play at trial, and did not know what was on the recording.

Trial counsel stated that he did not obtain a copy of Quincy Fitzgerald's statement, but he spoke with Mr. Fitzgerald directly. Trial counsel recalled petitioner's asking him to use Mr. Fitzgerald as a defense witness, but trial counsel could not locate Mr. Fitzgerald to subpoena him. Mr. Fitzgerald made himself available, and trial counsel remembered seeing Mr. Fitzgerald in court. However, when it was time for Mr. Fitzgerald to testify, trial counsel was unable to find him. When asked whether he interviewed Lawanda Pearson, a potential defense witness, trial counsel stated that her name sounded familiar, but he did not recall speaking to her directly. Trial counsel remembered petitioner's mother being in the courtroom with a woman to whom he tried to speak, but he did not know whether that woman was Ms. Pearson.

Trial counsel did not recall whether he sent petitioner a copy of the indictment. Trial counsel denied that he never visited petitioner in jail. Trial counsel did not recall whether

he sent petitioner copies of discovery. He agreed that he did not file any motions in limine for petitioner's case.

Trial counsel agreed that part of petitioner's defense was the allegation that the victims engaged in prostitution. He did not recall whether he obtained criminal records of the victims or the cousin's neighbor. Trial counsel was aware that he was entitled to any "*Jencks* material, statements[,] or anything of that matter that [witnesses] made before trial." Trial counsel did not ask for *Jencks* material after the testimonies of the cousin's neighbor, Officer Charles Boles, Sandy Myers, Sharon Jenkins, Detective Suzanne Stevens, Constance Howard, Raymond Raider, or Charles Jackson. Trial counsel did not voir dire Ms. Howard, whom the State qualified as an expert witness.

Trial counsel denied that he decided petitioner would testify. Trial counsel recalled that petitioner told him his version of events, which included allegations that the victims had engaged in prostitution. Petitioner claimed that the incident was "essentially a prostitution deal gone bad." Trial counsel advised petitioner that he would have to introduce the information about the alleged prostitution through his testimony, and they discussed petitioner's testifying in his own defense. Trial counsel explained that he did not make an oral motion for a jury-out hearing when petitioner testified because petitioner "told a compelling story in the sense that he knew exactly what happened. He was in that room and it was a visceral kind of experience. The way he explained it to [trial counsel] during [their] interview, . . . it was almost kind of an emotional kind of thing." Trial counsel wanted the jury to see petitioner "as a human being and sort of being [misled]."

Trial counsel did not recall filing a motion in limine or making an oral motion during trial to have a jury-out hearing regarding the admissibility of petitioner's prior convictions. He further recalled that the State, in open court, clarified that petitioner was actually convicted of facilitation of robbery and not robbery.

Trial counsel "vaguely" remembered a synopsis of Mr. Fitzgerald's statements to Detective Johns that the State included in its discovery. He said that Mr. Fitzgerald's statement that the victims approached petitioner attempting to buy "dope" might have been beneficial to petitioner's defense because it showed consent for petitioner to enter the house. Trial counsel recalled

> being in a conversation with the Judge specifically on the issue of Mr. Fitzgerald[,] highlighting the fact that Mr. Fitzgerald had made himself unavailable for . . . the process of the service of a subpoena and had continued to do so for the entire time that [petitioner] had been in Davidson County custody[.]

He also recalled that the judge was upset with him for not subpoenaing Mr. Fitzgerald as a witness.

Trial counsel advised petitioner that he was unable to find Mr. Fitzgerald, and petitioner gave trial counsel information about where Mr. Fitzgerald might have been. Mr. Fitzgerald was inside the courtroom on May 3rd, although trial counsel had not subpoenaed him. Trial counsel said he did not subpoena Mr. Fitzgerald as a witness for trial because Mr. Fitzgerald advised him that he would be available. Trial counsel agreed that if he had subpoenaed Mr. Fitzgerald and Mr. Fitzgerald did not come to court, petitioner would have had the legal right to a continuance.

At some point during petitioner's trial, Mr. Fitzgerald was found. Trial counsel spoke with him in the gallery before court. Mr. Fitzgerald testified during the defense's jury-out offer of proof. Trial counsel told the court he was going to ask Mr. Fitzgerald about the victims' waving petitioner over to them; however, he did not recall his failure to ask that question. He also did not recall the trial judge's having to ask the question during the hearing. Trial counsel vaguely remembered asking Mr. Fitzgerald about the cousin's prior drug use. He stated that "there were . . . other issues regarding . . . this alleged victim that [Mr. Fitzgerald] could . . . bring light to bear on . . . ." Trial counsel testified that although he told the court that he was going to ask Mr. Fitzgerald about the cousin's behavior but did not, he asked her about elements of her behavior he thought were germane.

Trial counsel testified that petitioner told authorities that the victims were trying to buy cocaine from him. Trial counsel recalled that the victim's blood screen showed that she had cocaine in her system. He remembered that the victim testified that she had used cocaine approximately two weeks before the rape. Trial counsel agreed that the victims' attempt to purchase cocaine from petitioner would have been an issue for the defense and that the victim's drug screen would have possibly been valuable to the defense. However, he said ultimately that the case came down to the two victims, who told the same story, against petitioner.

Trial counsel did not file the appropriate motion, pursuant to Rule 412 of the Tennessee Rules of Evidence, to offer evidence of the victims' sexual behavior. The State filed a motion in limine to prohibit trial counsel from questioning the victims regarding their prior sexual conduct. Trial counsel explained that the allegation that the victims had previously engaged in prostitution "was not a keystone of [his] defense" because petitioner could not provide any information regarding the allegation, and they "had no independent knowledge of [the victims'] behavior." Petitioner told trial counsel that Mr. Fitzgerald had direct knowledge of the victims' pasts. Trial counsel said it was possible that a prostitution

-11-

conviction in the victims' criminal records would have imputed knowledge of past prostitution; however, he did not investigate the victims' criminal records.

Trial counsel only included the issue of sufficiency of the convicting evidence in the motion for new trial. With the monitoring attorney's permission, trial counsel signed the monitoring attorney's name to the motion for new trial. Trial counsel agreed that because he only included an argument regarding sufficiency of the evidence in the motion for new trial, it was the only issue that petitioner could pursue on appeal.

Regarding petitioner's assertion that trial counsel failed to object to leading questions and the admission of hearsay during the State's case-in-chief, trial counsel had no recollection and said he would let the transcript of the trial "speak for itself." Trial counsel could not recall why he did not file any motions, obtain a copy of the 9-1-1 recording, or obtain *Jencks* material.

Trial counsel did not remember whether petitioner informed him of his past mental health problems or that petitioner met Mr. Fitzgerald while in the Dede Wallace Youth Services, Wilderness Division, a program that assisted troubled children and youth and the mentally ill. Trial counsel did not file a motion for a mental evaluation of petitioner but said that if he had a reason for filing such a motion, he would have filed it. He agreed that it was possible that if petitioner had a mental problem, he could have used it as a mitigating factor at the sentencing hearing.

Trial counsel could not recall if he answered the State's request for discovery, submitted possible mitigating factors for the presentence report, or gave petitioner a copy of the presentence report. However, he said that he agreed with the record if it reflected that he did not do those things. Trial counsel did not remember raising the *State v. Anthony*[3] issue at the sentencing hearing and was unaware that this court reversed the especially aggravated kidnapping convictions on appeal.

Petitioner testified that his family retained trial counsel to represent him. Trial counsel only visited petitioner once while he was in jail. Petitioner was on probation when he was charged with the underlying crimes and was in the local jail for six days before being transferred to the Metro-Davidson County Detention Facility. Trial counsel did not visit petitioner in the Metro-Davidson County Detention Facility; however, he met with petitioner

---

[3] *See State v. Anthony*, 817 S.W.2d 299, 306 (Tenn. 1991) (holding that dual convictions for armed robbery and aggravated kidnapping violated the due process guarantees of article I, section 8 of the Tennessee Constitution when the confinement, movement, or detention of the kidnapping were "essentially incidental" to the robbery), *overruled by State v. White*, 362 S.W.3d 559, 578 (Tenn. Mar. 9, 2012).

every time they had a court date. Petitioner said he and trial counsel met in the "bull pen," where other inmates and attorneys met, and they could occasionally have private conversations.

Petitioner initially testified that trial counsel never told him that the supreme court had suspended him from the practice of law. However, he later testified that trial counsel told him that he had to renew his license. Petitioner said he did not understand that the license renewal was related to suspension or disbarment. Petitioner said that he met with trial counsel's monitoring attorney once in the bull pen but did not see him again.

Petitioner and trial counsel did not discuss the recorded conversation between petitioner and Officer Finchum. Petitioner was unaware that the recording existed and that trial counsel failed to obtain a copy of it. Petitioner did not see the statement he gave to Detective Johns, and trial counsel did not discuss the statement with him. Trial counsel did not file a motion to suppress petitioner's statements, and they never discussed trial counsel's filing a motion to suppress. In addition, trial counsel did not discuss the physical evidence with petitioner. Petitioner did not see any of the crime scene photographs or discovery before trial. Petitioner did not know about the 9-1-1 recording because trial counsel did not obtain a copy of the recording or discuss the content of the recording with petitioner.

Petitioner testified that he and trial counsel never discussed Mr. Fitzgerald's statement. Petitioner did not see Mr. Fitzgerald's statement to the detectives until post-conviction counsel showed it to him. According to petitioner, Mr. Fitzgerald's statement could validate what he said about the victims' stopping him and wanting to buy drugs from him. He wanted trial counsel to subpoena Mr. Fitzgerald because he was with petitioner during the incident and could corroborate petitioner's version of the events.

Petitioner advised trial counsel to investigate Mr. Fitzgerald and Ms. Pearson as potential witnesses. He said that Mr. Fitzgerald and Ms. Pearson were outside the house when the incident occurred. Petitioner was unsure, but he did not believe that trial counsel met with Ms. Pearson. He said that trial counsel did not use Ms. Pearson as a witness at trial, which upset him because his mother had brought her to court. Petitioner was also upset that trial counsel told him that he had subpoenaed Mr. Fitzgerald, but when it was time for Mr. Fitzgerald to testify, trial counsel was unable to find him. He recalled that the trial judge admonished trial counsel for not subpoenaing Mr. Fitzgerald and that Tim Dickerson eventually found Mr. Fitzgerald.

Petitioner stated that trial counsel did not obtain criminal records for the victims or the neighbor of the cousin. He said that he was "baffled" that trial counsel did not obtain the neighbor's criminal records because the neighbor testified in "criminal clothes," his orange

prison uniform. Petitioner said that part of his defense was that the victims were trying to exchange sex for drugs, and their alleged past prostitution was an issue.

Petitioner testified that trial counsel was supposed to meet with him to prepare for trial but never did. Petitioner stated that trial counsel "made the decision to put [him] on the stand." He explained, "[T]hat was my attorney, anything he would have ask[ed] me to [do,] I would have [done]. He asked me to get on the stand. I got on the stand." Petitioner said that he was unaware that he had the constitutional right to not testify, and trial counsel never advised him that he could decline to testify. He further said trial counsel had not discussed any of the questions that he would ask during direct examination. Petitioner had a prior conviction for facilitation of aggravated robbery but testified during his trial that he was carrying the gun for protection because of a prior robbery conviction. He said that the prosecutor corrected him and told him it was facilitation of aggravated robbery.

Petitioner did not discover that the toxicology report indicated that the victim had cocaine in her system until post-conviction counsel gave him the discovery. Petitioner said that he asked trial counsel for his file immediately after the jury convicted him. Petitioner was having problems with trial counsel's representation and filed a complaint. He said that he did not hear from trial counsel after the guilty verdict. Petitioner's mother asked the trial court clerk about petitioner's appeal, and the clerk advised her that trial counsel had not filed a notice of appeal. Petitioner, with the help of a "layman down in Hard[e]man County," filed a late notice of appeal. Trial counsel never filed an appellate brief on behalf of petitioner. When trial counsel failed to meet the August 14th deadline, petitioner filed a motion for the appointment of counsel, and the trial court appointed him an attorney for his appeal.

Petitioner testified that trial counsel asked him about his background during their initial meeting. He advised petitioner about his history of drug abuse and juvenile detentions. While he was incarcerated, petitioner had several mental evaluations performed on him. Because of the results of the mental evaluations, he was sent to the Dede Wallace Youth Services, Wilderness Division.

On cross-examination, petitioner testified that his mother filed the first complaint to the Board of Professional Responsibility. The complaint stated that petitioner told his mother in February of 1999 that trial counsel had lost his license but introduced him to another attorney who would help him until trial counsel regained his license. However, petitioner did not recall giving that information to his mother.

Petitioner stated that trial counsel should have filed a motion to suppress his statement. Petitioner further stated that he was aware that the State did not play his statement at trial. He was unaware, however, that the State could question him about his statement if

-14-

he testified inconsistently with it during trial. When asked on what basis trial counsel should have filed a motion in limine, petitioner answered that trial counsel should have discussed the facts with him and determined the basis for a motion in limine.

Petitioner testified that despite trial counsel's failure to subpoena him, Mr. Fitzgerald testified at petitioner's trial. Petitioner further testified that "a better lawyer" would have asked Mr. Fitzgerald about the victims' blowing the horn at him and Mr. Fitzgerald in an attempt to purchase drugs. Petitioner agreed, however, that trial counsel asked Mr. Fitzgerald about the women stopping the two of them. He did not remember Mr. Fitzgerald testifying that he was not close enough to hear petitioner's discussion with the victims.

Petitioner stated that he would testify again in another trial if given the opportunity. He said that if trial counsel had been the perfect lawyer, he would not have testified any differently from what he did at trial. He later somewhat equivocated on that point and stated:

> I want to testify, all right, and I would have testified . . . it is always my decision to testify and tell my version of the facts, but if my attorney would have came [sic] to me and broke everything down to me and told me look, man, if you testify they are going to use your prior convictions to impeach your testimony . . . and advise[d] me of the disadvantages and advantages of testifying or let me know that I have even a constitutional right not to testify or testify.

He further stated that his decision about whether he would testify again if he had the chance depended on how the trial judge ruled in a jury-out hearing and if his attorney filed a motion for new trial.

Petitioner agreed that the State questioned him about whether he denied bringing the gun into the house in his statement. Petitioner testified at trial that he brought the gun into the house. He said that he did not know the contents of his statement because he was intoxicated when he gave his statement to police. He said that if he had known that his prior statement indicated that he did not have a gun when he entered the house, he would have still testified truthfully that he had a gun when he entered the house. Petitioner said that if trial counsel had consulted with him regarding his testimony, he would not have admitted that he had a robbery conviction while testifying.

Barbara Larkins Grizzard, petitioner's mother, testified that she filed a complaint against trial counsel with the Board of Professional Responsibility on June 23, 1999. Ms. Grizzard stated that the portion of her complaint that stated, "'In February my son contacted

me and asked if I knew [trial counsel] had lost his license. [Trial counsel] had introduced my son to a lawyer that [sic] would help until he got his license back," was accurate.

On cross-examination, Ms. Grizzard testified that trial counsel told her that "he had all of the charges beat but one," and she included this statement in her complaint. Ms. Grizzard gave trial counsel the names and telephone numbers of Mr. Fitzgerald and Ms. Pearson as potential witnesses. She said trial counsel asked her to bring Ms. Pearson to court, but he never said a word to her. She further said that trial counsel told her that he could not use Ms. Pearson as a witness. Ms. Grizzard did not bring Mr. Fitzgerald to court. She stated that trial counsel knew how to contact him and talked to him several times. According to Ms. Grizzard, trial counsel told her that he was going to hire a private investigator but did not. She attempted to contact trial counsel before and after the trial and trial counsel never returned her calls.

After hearing the evidence, the post-conviction court took the matter under advisement. On March 16, 2011, the court entered a written order making several findings of fact and denying the petition for post-conviction relief. Petitioner appeals the post-conviction court's denial of relief.

## II. Analysis

### Standard of Review

To obtain relief in a post-conviction proceeding, a petitioner must demonstrate that his or her "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2006); *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010) (citing *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009)). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Lane*, 316 S.W.3d at 562 (quoting *Grindstaff*, 297 S.W.3d at 216).

Appellate courts do not reassess the trial court's determination of the credibility of witnesses. *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009) (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)). Questions regarding the credibility of witnesses are matters entrusted to the trial judge as the trier of fact. *Dellinger*, 279 S.W.3d at 292 (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). The post-conviction court's findings of fact carry the weight of a jury verdict and are conclusive on appeal unless the preponderance of the evidence is otherwise. *Rigger v. State*, 341 S.W.3d 299, 307 (Tenn. Crim. App. 2010) (citing

*Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997)). However, conclusions of law receive no presumption of correctness on appeal. *Rigger*, 341 S.W.3d at 307 (citing *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001)). As a mixed question of law and fact, this court's review of petitioner's ineffective assistance of counsel claims is de novo with no presumption of correctness. *Dellinger*, 279 S.W.3d at 294 (citing *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007)).

The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and article I, section 9 of the Tennessee Constitution require that a criminal defendant receive effective assistance of counsel. *Cauthern v. State*, 145 S.W.3d 571, 598 (Tenn. 2004) (citing *Baxter v. Rose*, 523 S.W.2d 930 (Tenn.1975)). The constitutional right to counsel attaches when adversarial judicial proceedings are initiated against the defendant. *State v. Mitchell*, 593 S.W.2d 280, 286 (Tenn. 1980). "Initiation" is construed as issuance of an arrest warrant, the time of the preliminary hearing in cases where an arrest warrant is not first issued, or by indictment or presentment issued by a grand jury. *Id.* at 286.

To prevail on his claim of ineffective assistance of counsel, petitioner must demonstrate both that his lawyer's performance was deficient and that the deficiency prejudiced the defense. *Finch*, 226 S.W.3d at 315; *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Baxter*, 523 S.W.2d at 936)). To prove that counsel's performance was deficient, petitioner must establish that his attorney's conduct fell below an objective standard of "'reasonableness under prevailing professional norms.'" *Finch*, 226 S.W.3d at 315 (quoting *Strickland*, 466 U.S. at 688). As our supreme court has previously held:

> '[T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.'

*Baxter*, 523 S.W.2d at 934-35 (quoting *Beasley v. United States*, 491 F.2d 687, 696 (6th Cir. 1974)). On appellate review of trial counsel's performance, this court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689); *see Finch*, 226 S.W.3d at 316.

To establish that petitioner suffered prejudice as a result of counsel's deficient performance, petitioner "'must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different.'" *Finch*, 226 S.W.3d at 316 (quoting *Vaughn*, 202 S.W.3d at 116). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Vaughn*, 202 S.W.3d at 116 (quoting *Strickland*, 466 U.S. at 694); s*ee Finch*, 226 S.W.3d at 316. As such, petitioner must establish that his attorney's deficient performance was of such magnitude that he was deprived of a fair trial and the reliability of the outcome was called into question. *Vaughn*, 202 S.W.3d at 116 (citing *Strickland*, 466 U.S. at 694; *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999)).

Petitioner must establish both deficient performance and prejudice therefrom to be entitled to post-conviction relief. *Vaughn*, 202 S.W.3d at 116*; Howell*, 185 S.W.3d at 326. It follows that if this court holds that either prong is not met, we are not compelled to consider the other prong. *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004).

On appeal, petitioner argues that the post-conviction court erred in denying his petition for post-conviction relief because trial counsel committed errors that deprived him of his right to effective assistance of counsel. Specifically, petitioner lists forty-one instances of trial counsel's deficient performance and prejudice, some of which we have consolidated for review. Petitioner further claims that trial counsel failed to subject the State's case to meaningful adversarial testing; thus, petitioner is not required to show prejudice.

In *United States v. Cronic*, 466 U.S. 648 (1984), the United States Supreme Court identified three specific instances when courts may presume prejudice without the necessity of inquiring into counsel's actual performance at trial. *Id.* at 662. Those instances are: (1) situations that involve "the complete denial of counsel," when the accused is denied the presence of counsel at "a critical stage" in the proceeding; (2) when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (3) situations when "counsel is available to assist the accused during trial[; however,] the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id*. at 659-60. "The *Cronic* case addressed claims of per se ineffectiveness and raised a presumption of prejudice which absolved the petitioner from the need to prove the *Strickland* elements of ineffective assistance of counsel." *Daniel Decker v. State*, No. E2010-02194-CCA-R3PC, 2011 WL 6813193, at *17 (Tenn. Crim. App. Dec. 22, 2011), *perm. app. denied* (Tenn. Mar. 7, 2012).

In his brief, petitioner asserts that trial counsel entirely failed to subject the State's case to meaningful adversarial testing and that "there was a complete breakdown of the adversarial process." We disagree. Under *Cronic*, trial counsel's failure must be complete

for a court to presume prejudice based on trial counsel's failure to test the State's case. *See id.* (quoting *Bell v. Cone*, 535 U.S. 685, 697 (2002)). Here, trial counsel cross-examined the State's witnesses, called witnesses on behalf of petitioner, and advanced petitioner's argument that the incident was a "drug deal gone bad." The record does not show that trial counsel *entirely* failed to test the State's case. Accordingly, we review petitioner's claims of ineffective assistance of counsel under the *Strickland* standard.

*Pretrial errors*

Petitioner raises several instances of deficient performance arising pretrial. Specifically, petitioner argues that trial counsel failed to: (1) obtain petitioner's statements to police and review them with petitioner; (2) review evidence, including photographs and the 9-1-1 tape; (3) obtain Mr. Fitzgerald's statement; (4) respond to the State's request for discovery and send petitioner a copy of the indictment and discovery; (5) visit petitioner in jail and prepare petitioner for trial; (6) file pretrial motions; (7) investigate the case and interview witnesses; (8) obtain witnesses' criminal records; and (9) inform petitioner that the Board of Professional Responsibility suspended his law license.

In its order denying post-conviction relief, the post-conviction court found that trial counsel was deficient in failing to obtain petitioner's statements; however, counsel's failure to obtain the statements was "not so damaging at trial to warrant a finding of prejudice." The record supports the court's finding. The State did not introduce petitioner's statement to Officer Finchum into evidence, and it did not use the statement to impeach petitioner. Furthermore, although the State introduced petitioner's statement to Detective Johns and petitioner testified contrary to his prior statements, petitioner explained his inconsistent statements on cross-examination and redirect examination. Petitioner is not entitled to relief on this issue.

Regarding trial counsel's failure to review evidence, the post-conviction court found that although counsel did not examine the physical evidence in the property room, view the crime scene photographs, or obtain a copy of the 9-1-1 tape, petitioner failed to show how counsel's not doing so prejudiced him. The court noted that petitioner's possession of the gun during the crime was undisputed, that the rape kit evidence did not establish non-consensual sexual contact, and that the State did not play the 9-1-1 call to the jury. Thus, the court found that petitioner failed to show prejudice. The record supports the post-conviction court's determinations and petitioner is not entitled to relief based on trial counsel's failure to review certain evidence.

The post-conviction court found that trial counsel should have obtained Mr. Fitzgerald's statement; however, petitioner did not show that counsel's failure to obtain the

statement prejudiced him. The post-conviction court accredited trial counsel's testimony that he was aware of the synopsis of Mr. Fitzgerald's statement. The court noted that trial counsel questioned Mr. Fitzgerald about the statement and gave him an opportunity to explain any inconsistencies between his statement and his trial testimony. The State did not use the statement to impeach Mr. Fitzgerald. The evidence supports the post-conviction court's finding. In light of trial counsel's examination of Mr. Fitzgerald regarding his statement and the State's not using the statement to impeach Mr. Fitzgerald, we conclude that petitioner has not shown trial counsel's failure to obtain Mr. Fitzgerald's full statement prejudiced petitioner.

Regarding counsel's failure to respond to its request for discovery, the State replied, "Nobody ever does," in its response to the amended petition for post-conviction relief. The post-conviction court found that "the ultimate issues [at trial] centered around two disputed points," and any discoverable item had an insignificant probative value toward these two issues. The issues at trial were the circumstances under which petitioner entered the home and whether the sexual activity was consensual. The deciding factor of the case was the witnesses' credibility, and the discovery would have had little impact on the outcome. Therefore, petitioner has not shown that trial counsel's failure to respond to the State's request for discovery prejudiced his case.

Moreover, the post-conviction court found that even if trial counsel did not give petitioner a copy of the indictment, there was "an extremely high likelihood that [trial counsel] informed [petitioner] about what he was charged with in the indictment." We agree with the post-conviction court's finding. It is clear that petitioner knew the crimes for which he had been indicted because he gave several statements regarding his version of the events and helped formulate his defense of the victims' alleged prostitution. Petitioner has not shown that trial counsel's failure to respond to the State's discovery and failure to give him a copy of the indictment and discovery prejudiced him in any way.

The post-conviction court accredited trial counsel's testimony that he met with petitioner more than once while petitioner was in jail. In addition, the court noted that petitioner and trial counsel met several times on court dates to discuss the case. Thus, the court found that petitioner failed to show that trial counsel was deficient for failing to meet with him or that he suffered any prejudice because of trial counsel's alleged failures. We agree.

Petitioner complains that trial counsel failed to file pretrial motions. Specifically, he contends that trial counsel should have filed a motion to suppress his statements, motions in limine, a motion to offer evidence of the victims' sexual behavior, and a motion to instruct the jury on lesser-included offenses. The post-conviction court noted that petitioner did not

show any legitimate bases upon which trial counsel could have filed a motion to suppress. The court further found that even if trial counsel had filed a successful motion to suppress, the State could have still used petitioner's statement to impeach him. The court found that trial counsel was deficient for failing to file a written motion or make an oral motion in limine to determine the admissibility of petitioner's prior conviction, which is a "common and standard motion when the defense theory will necessitate the defendant testifying at trial." However, the court also found that petitioner's prior conviction would have been admissible at trial for impeachment, that cross-examination of petitioner corrected his misstatement about his prior conviction, and there were no other issues upon which petitioner claimed trial counsel should have filed a motion in limine. Regarding the motion to offer evidence of the victims' sexual behavior, the post-conviction court accredited trial counsel's testimony that petitioner could not provide any person to corroborate his allegations of the victims' previous involvement in prostitution and that trial counsel attempted to investigate petitioner's claim. As noted by the post-conviction court, petitioner did not present any evidence at the post-conviction hearing supporting the victims' involvement in prostitution. We agree that petitioner failed to show trial counsel's failure to file any of the above motions prejudiced him. Petitioner is not entitled to relief on this issue. *See Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997).

Petitioner argues that trial counsel failed to investigate the case and interview witnesses. The post-conviction court noted that petitioner failed to present witnesses during the post-conviction hearing to establish prejudice. When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, a petitioner should present those witnesses at the evidentiary hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Without any proof as to the testimony that the witnesses would have offered, or the additional evidence that further investigation would have uncovered, the petitioner cannot demonstrate that he was prejudiced by counsel's performance in this regard and is not entitled to relief.

Trial counsel testified that he did not recall whether he obtained the criminal records of the victim, the cousin, or the cousin's neighbor. The post-conviction court found that trial counsel was deficient if he did not attempt to obtain the records; however, petitioner failed to present the criminal records at the hearing. By not offering the criminal record and their contents, petitioner failed to show how trial counsel's failure to obtain the records prejudiced him. Therefore, petitioner failed to show both deficient performance and prejudice, and he is not entitled to relief based up on this issue.

Petitioner claims that trial counsel failed to inform him that the Board of Professional Responsibility suspended trial counsel's law license. The post-conviction court found that Ms. Grizzard's testimony belied this allegation. Ms. Grizzard testified that her complaint to

the Board of Professional Responsibility included her statement that petitioner told her in February that trial counsel had lost his law license. Thus, the post-conviction court declined to accredit petitioner's testimony that he was unaware of trial counsel's suspension. The evidence does not preponderate against the trial court's finding.

*Errors at Trial*

Regarding trial counsel's performance at trial, petitioner asserts that trial counsel failed to: (1) obtain *Jencks* material; (2) voir dire the State's expert; (3) request a hearing regarding the admissibility of petitioner's prior convictions before deciding that petitioner would testify; (4) subpoena Mr. Fitzgerald; (5) properly question Mr. Fitzgerald during the offer of proof; (6) properly question the victim; (7) object during trial; and (8) subpoena Ms. Pearson and call her as a witness.

Petitioner argues that trial counsel should have obtained *Jencks* material for several State witnesses. The State responded that it had a continuing, mandatory duty to give petitioner any information that was inconsistent with a witness's testimony and that most of the facts to which its witnesses testified were undisputed. The post-conviction court noted that petitioner did not produce any evidence at the post-conviction hearing as to the existence of *Jencks* material or how trial counsel's failure to request any such evidence prejudiced him. The court further noted that trial counsel requested *Jencks* material from the most important witnesses, the victims. Accordingly, the court found that petitioner failed to prove that trial counsel's failure to obtain *Jencks* material prejudiced him. The evidence supports this finding. We conclude that petitioner has failed to prove the prejudice prong and is not entitled to relief.

Petitioner claimed that trial counsel was deficient for failing to voir dire the State's expert, TBI agent Constance Howard. The court found that although trial counsel did not question the expert's credentials, he elicited, on cross-examination, that her findings only indicated sexual activity and not whether the sexual activity was consensual. The court found that petitioner did not prove that trial counsel's failure to question Ms. Howard about her credential prejudiced him. The evidence supports the post-conviction court's finding.

Next, petitioner argues that trial counsel made the decision that petitioner would testify. The post-conviction court found that petitioner and trial counsel discussed whether petitioner should testify. At the post-conviction hearing, petitioner stated that he had always wanted to tell his side of the story: that the sex was consensual. The post-conviction court also noted that petitioner's defense theory made it "almost imperative" that he testify at trial. The post-conviction court also reviewed the testimony of the victims at trial and concluded that it was consistent and appeared credible. The consistent testimony of the victims would

likely also make petitioner's testimony necessary because petitioner stated at the post-conviction hearing that he would likely testify in another trial and because of the necessity of his testimony to support his defense theory. Accordingly, we cannot conclude that trial counsel's alleged deficiency in not properly advising petitioner about whether to testify prejudiced petitioner.

Petitioner asserts that trial counsel was ineffective for failing to subpoena Mr. Fitzgerald and not properly questioning Mr. Fitzgerald. The post-conviction court agreed with petitioner that trial counsel should have subpoenaed Mr. Fitzgerald, but the court did not find that the failure to subpoena resulted in any prejudice because Mr. Fitzgerald testified on petitioner's behalf. Petitioner alleged that trial counsel was ineffective for failing to question Mr. Fitzgerald about the cousin's past drug use. The post-conviction court found that Mr. Fitzgerald could not testify that he ever observed the drug use of the cousin. Thus, the court properly excluded the evidence, and petitioner did not prove that trial counsel's failure to "press the admissibility" of Mr. Fitzgerald's testimony was prejudicial. Further, petitioner complained that trial counsel did not ask Mr. Fitzgerald about the victims' waving petitioner over to them and the trial court had to question him about it. Even if trial counsel were deficient for failing to ask that question, it did not prejudice petitioner because the trial court asked the question and heard the answer. Based on this, it is clear that trial counsel's failure to subpoena Mr. Fitzgerald or his failure to question Mr. Fitzgerald about the cousin's past drug use and the victims' waving petitioner over to them did not prejudice petitioner.

Petitioner further asserts that trial counsel failed to properly question the victim regarding her past drug use. As the post-conviction court noted, trial counsel asked the victim multiple questions about her drug use and prior drug purchases. Petitioner did not offer any testimony regarding any further information trial counsel could have uncovered by "properly questioning" the victim. Consequently, petitioner has failed to prove that trial counsel's examination of the victim was deficient or prejudicial. He is not entitled to relief.

Petitioner contends that trial counsel failed to object to leading questions and hearsay testimony during the State's case-in-chief, specifically, during the neighbor's testimony on redirect examination. The post-conviction court found that while the prosecutor asked two leading questions, the answers provided were restatements of answers he had given on direct examination. The court further found that petitioner failed to prove prejudice because any damage from the statements was properly admitted during the neighbor's testimony on direct examination. The record supports the post-conviction court's finding that petitioner was not prejudiced. Petitioner has not satisfied both prongs of the *Strickland* test and thus, is not entitled to relief.

According to petitioner, trial counsel was ineffective for failing to subpoena Ms. Pearson and call her as a witness. Petitioner did not present Ms. Pearson as a witness during the post-conviction hearing. *See Black,* 794 S.W.2d at 757 (noting that "neither a trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a material witness or what a witness's testimony might have been if introduced by defense counsel"). As such, petitioner has failed to show that Ms. Pearson's not testifying prejudiced him. He is not entitled to relief based upon this issue.

*Post-Trial Errors*

Moreover, petitioner alleges that trial counsel committed several errors post trial, including the sentencing and appeal stages. Petitioner claims that trial counsel failed to (1) give petitioner and post-conviction counsel a copy of petitioner's file; (2) object to the trial court's alleged *Blakely v Washington*[4] violation; (3) raise the *State v. Anthony*[5] issue concerning his dual conviction for kidnapping and robbery; (4) review the presentence report; (5) request a mental evaluation and present mitigating factors; (6) raise more than one issue on appeal; and (7) timely file petitioner's notice of appeal and appellate brief.

Petitioner alleges that trial counsel failed to give petitioner and post-conviction counsel a copy of petitioner's file. The post-conviction court found that prejudice would not have resulted from this issue. The court explained that petitioner's allegation is based on a post-trial failure and prejudice occurs when there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. We agree with the trial court's findings. Petitioner cannot show prejudice based upon this issue and is therefore, not entitled to relief on this issue.

Petitioner asserts that trial counsel was deficient for failing to raise the *State v. Anthony* issue concerning his dual conviction for kidnapping and robbery. *See State v. Anthony*, 817 S.W.2d 299, 306. The post-conviction court found that "any prejudice that could have resulted from [trial counsel's] failure in regards to this issue was ultimately nullified when [this court] provided relief to petitioner on this issue." *See Darryl A. Larkins*, 2001 WL 543442, at *9 (concluding that petitioner's convictions for aggravated rape and attempted aggravated rape together with especially aggravated kidnapping violated the

---

[4] *See Blakely v. Washington*, 542 U.S. 296, 303 (2004) ("'Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

[5] *See Anthony*, 817 S.W.2d at 306.

principles of due process). We agree. This court reversed and dismissed petitioner's especially aggravated kidnapping convictions. Thus, trial counsel's failure to raise this issue did not prejudice petitioner, and petitioner is not entitled to relief.

The next issue petitioner raises is trial counsel's failure to review the presentence report with him or give him a copy of the presentence report. Trial counsel testified that he did not recall whether he gave petitioner a copy of the presentence report. Even if trial counsel did not give him a copy of the presentence report, petitioner did not offer any proof as to how his having a copy of the presentence report would have affected the outcome of his sentencing hearing. Accordingly, petitioner has failed to prove that trial counsel was deficient in this regard or that any alleged deficiency prejudiced petitioner.

Petitioner contends that trial counsel was deficient for failing to request a mental evaluation of petitioner so that petitioner could use his mental status as a mitigating factor. He further contends that counsel was deficient for not presenting any mitigating factors at the sentencing hearing. At the post-conviction hearing, trial counsel could not recall whether petitioner informed him of his mental issues, but petitioner testified that he told trial counsel about his mental health illness. Although the petitioner testified that he had a history of mental illness, petitioner did not offer any evidence of his mental illness or any other potential mitigating factors at the post-conviction hearing. Therefore, we conclude that he has not demonstrated that his attorney was ineffective for failing to request a mental evaluation or failing to present mitigating factors.

Petitioner argues that trial counsel was deficient for his failure to raise more than one issue in the motion for new trial. The post-conviction court noted that petitioner did not address any additional issues that trial counsel should have raised and found that petitioner failed to prove that trial counsel was deficient or that counsel's only raising one issue on appeal prejudiced him. "If a claim of ineffective assistance of counsel is based on the failure to raise a particular issue, as it is in this case, then the reviewing court must determine the merits of the issue." *Carpenter v. State*, 126 S.W.3d 879, 887 (Tenn. 2004) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986)). Petitioner did not offer any additional issues for our determination of whether trial counsel was ineffective for failing to raise them in the motion for new trial. Thus, petitioner has failed to meet his burden of proving that counsel was ineffective.

Trial counsel did not timely file petitioner's notice of appeal and appellate brief. However, this court granted petitioner a direct appeal despite the untimely notice. A different attorney represented petitioner for his direct appeal and filed a brief. The post-conviction court found that while trial counsel was deficient for failing to file a timely notice of appeal, it did not prejudice petitioner because he was able to appeal his case. We agree.

This court waived the timely filing of the notice of appeal in the interest of justice, and petitioner did not suffer any prejudice from trial counsel's failure to file a timely notice of appeal. He is not entitled to relief based upon this issue.

Finally, petitioner argues the trial court relied on facts not proven by a jury, violating *Blakely v. Washington. See Blakely*, 542 U.S. at 303. The post-conviction court found that petitioner waived this allegation, and the allegation was not the proper subject matter for a petition for post-conviction relief. We agree with this finding. This court has previously held that "*Blakely* issues themselves are not cognizable in a post-conviction proceeding." *Walters v. State,* No. M2008-01806-CCA-R3-PC, 2009 WL 3400687, at *1 (Tenn. Crim. App. Oct. 20, 2009), *perm. app. denied* (Tenn. Apr. 14, 2010). Accordingly, petitioner is not entitled to relief on this issue.

In summary, the post-conviction court found,

> While there were a number of deficiencies by trial counsel, that in this case, . . . these deficiencies, either individually or in the aggregate, do not weigh sufficiently under the totality of the circumstances, to establish a reasonable probability that, but for counsel's deficiencies, the result of the proceedings would have been different or undermine[d] the [c]ourt's confidence in the outcome of the trial.

We agree with the post-conviction court. Therefore, we conclude that petitioner has not satisfied both prongs of the *Strickland* test for any issue that he appeals, and he is not entitled to relief.

## CONCLUSION

For the foregoing reasons, we affirm the post-conviction court's denial of post-conviction relief.

_____
ROGER A. PAGE, JUDGE